# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 4:22-CR-00362 |
| v. | (Chief Judge Brann) |
| DOUGLAS ROBINSON, | |
| Defendant. | |

## MEMORANDUM OPINION

### OCTOBER 25, 2023

Douglas Robinson, a felon who has previously been convicted of grand theft of a motor vehicle, has been indicted for being a felon in possession of firearms and ammunition. He seeks to dismiss the indictment against him on the ground that recent caselaw from the Supreme Court of the United States and the United States Court of Appeals for the Third Circuit demonstrates that 18 U.S.C. § 922(g)(1) is unconstitutional as applied to him. However, regulating the possession of firearms by individuals who have been convicted of serious felony offenses such as Robinson's prior conviction fall within the history and traditions of our Nation. Accordingly, Robinson's motion to dismiss will be denied.

## I.     BACKGROUND

In 2022, Robinson was indicted for unlawful possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1).[1] The Government alleges that

---

[1] Doc. 1. The Indictment also contains a forfeiture allegation.

Robinson has previously been convicted of a felony offense, thereby prohibiting him from possessing a firearm, but he nevertheless possessed a handgun and ammunition that had traveled in and affected interstate commerce.[2]

Although not set forth in the indictment, records from the Fifteenth Judicial Circuit Court for Palm Beach County, Florida, demonstrate that Robinson has previously been convicted of grand theft (motor vehicle), in violation of Fla. Stat. § 812.014(c)(6).[3] That offense is a third-degree felony and, under Florida law, is punishable by a maximum term of imprisonment of five years.[4] Robinson was sentenced to time served, along with twenty-four months' probation.[5]

Following the United States Court of Appeals for the Third Circuit's decision in *Range v. Attorney General of the United States*,[6] Robinson filed a motion to dismiss the indictment against him, arguing that, in light of *Range*, 18 U.S.C. § 922(g)(1) is unconstitutional as applied to him, since he is one of the people whom the Second Amendment of the United States Constitution protects and the Government cannot demonstrate that § 922(g)(1) as applied to him and his prior felony offense is within the historical traditions of this Nation.[7]

---

[2]  *Id.*
[3]  Doc. 36-1 at 9.
[4]  Fla. Stat. § 775.082(3)(e).
[5]  Doc. 36-1 at 9.
[6]  69 F.4th 96 (3d Cir. 2023).
[7]  Docs. 30, 31.

The Government responds that the indictment should not be dismissed, since § 922(g)(1) is constitutional as applied to Robinson.[8] First, the Government argues that the Second Amendment protects the right only to use firearms for a lawful purpose and, because Robinson does not maintain that he possessed firearms for any lawful purpose, his conduct falls beyond the protection of the Second Amendment.[9] Second, the Government contends that Robinson was on state probation at the time that he possessed his firearm in this offense, and he was lawfully prohibited from possessing a firearm pursuant to the terms of that custodial arrangement.[10]

Finally, the Government asserts that a prohibition on Robinson possessing firearms falls within the historical traditions of the United States.[11] Specifically, there is a longstanding tradition of disarming those who are deemed a danger to the public by having committed dangerous felonies.[12] And, the Government contends, Robinson's prior felony conviction for grand theft of a motor vehicle makes clear that he is a dangerous individual who should be stripped of his firearms.[13] Robinson has not filed a reply brief and the time to so do has now lapsed, rendering this matter ripe for disposition.

---

[8] Doc. 34.
[9] *Id.* at 5-12.
[10] *Id.* at 12-13.
[11] *Id.* at 14-21.
[12] *Id.* at 20-21.
[13] *Id.* at 18-21.

## II.  DISCUSSION

### A.  Current Second Amendment Law

The Second Amendment to the United States Constitution, which reads "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed,"[14] was long mistakenly interpreted as protecting the right to keep and bear arms in relation to militias.[15] In *United States v. Miller*, the Supreme Court noted that the Constitution provided the federal government with the power "[t]o provide for calling forth the Militia to execute the Laws of the Union" and held that "[w]ith obvious purpose to assure the continuation and render possible the effectiveness of such forces the declaration and guarantee of the Second Amendment were made. It must be interpreted and applied with that end in view."[16]

That mistaken interpretation was disabused, however, in 2008 when the Supreme Court in *District of Columbia v. Heller* determined "that the Second Amendment conferred an individual right to keep and bear arms" unconnected to militia service.[17] But that court emphasized that "the right was not unlimited, just as the First Amendment's right of free speech was not" and, therefore, it did "not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of

---

[14]  U.S. Const. amend. II.
[15]  *United States v. Miller*, 307 U.S. 174, 178-79 (1939).
[16]  *Id.* at 178.
[17]  554 U.S. 570, 595 (2008).

confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose*."[18] To emphasize that point, the Supreme Court stated:

> nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.[19]

The Supreme Court further qualified the right expressed in the Second Amendment when it noted "that the sorts of weapons protected were those in common use at the time . . . We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'"[20]

Two years later, in *McDonald v. City of Chicago, Illinois*, the Supreme Court reiterated those limitations to the Second Amendment.[21] There, it once again emphasized:

> It is important to keep in mind that *Heller,* while striking down a law that prohibited the possession of handguns in the home, recognized that the right to keep and bear arms is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as "prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." We repeat those assurances here.[22]

---

[18]   *Id.*
[19]   *Id.* at 626-27.
[20]   *Id.* at 627 (internal citation and quotation marks omitted).
[21]   561 U.S. 742, 786 (2010).
[22]   *Id.* (quoting *Heller*, 554 U.S. 570 at 626-27 (internal citations omitted)).

Those earlier decisions, however, left open the question of how the Second Amendment was to be applied to laws that restrict the right to carry arms. In 2022, the Supreme Court in *New York Rifle & Pistol Association, Inc. v. Bruen* held that the Second Amendment protects "an individual's right to carry a handgun for self-defense outside the home" and, in so doing, explained the proper legal test for courts to apply when determining whether a law violates the Second Amendment.[23] That test involves primarily a historical analysis:

> when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."[24]

The Supreme Court believed that such an historical analysis would be "fairly straightforward" in cases where "a challenged regulation addresses a general societal problem that has persisted since the 18th century."[25] In those circumstances, "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment;" so too "if earlier generations addressed the societal problem, but did

---

[23]   142 S. Ct. 2111, 2122 (2022).
[24]   *Id.* at 2126.
[25]   *Id.* at 2131.

so through materially different means" or if "some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds."[26]

If there was no historical analogue for the societal problem, the Supreme Court iterated that "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check."[27] In all circumstances, the Second Amendment "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."[28] Thus, when confronted with regulations "that were unimaginable at the founding," courts must reason "by analogy," which "requires a determination of whether the two regulations are relevantly similar" using "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense."[29]

In *Bruen*, the Supreme Court once again observed "that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."[30] Three of the Justices who signed on to the majority opinion in *Bruen* further elaborated that, in the words of Justice Samuel Alito, the opinion does

---

[26] *Id.*
[27] *Id.* at 2133.
[28] *Id.*
[29] *Id.* at 2132-33.
[30] *Id.* at 2128 (quoting *Heller*, 554 U.S. at 626).

not disturb "anything that we said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns."[31] Justice Brett Kavanaugh, joined by Chief Justice John Roberts, reiterated that:

> Properly interpreted, the Second Amendment allows a "variety" of gun regulations. *Heller*, 554 U.S. at 636. As Justice Scalia wrote in his opinion for the Court in *Heller*, and Justice Alito reiterated in relevant part in the principal opinion in *McDonald*:
>
> "Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. . . . [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. [Footnote 26: We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive.]
>
> "We also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those in common use at the time. We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Heller*, 554 U.S. at 626-627, and n. 26 (citations and quotation marks omitted); see also *McDonald*, 561 U.S. at 786 (plurality opinion).[32]

This leads the Court, finally, to the Third Circuit's recent *en banc* decision in *Range v. Attorney General of the United States*. There, the Third Circuit determined

---

[31] *Id.* at 2157 (Alito, J., concurring).
[32] *Id.* at 2162 (Kavanaugh, J., concurring, joined by Robert, C.J.).

8

in a "narrow" decision[33] that 18 U.S.C. § 922(g)(1) is unconstitutional as applied to Range, who had previously been convicted "of making a false statement to obtain food stamps in violation of Pennsylvania law."[34] The Third Circuit first addressed the "threshold question" of whether "Range is one of 'the people' who have Second Amendment rights."[35] It concluded that Range was, rejecting the notion that the people referred only to law-abiding, responsible individuals, since "'the people' as used throughout the Constitution 'unambiguously refers to all members of the political community, not an unspecified subset.'"[36]

Because § 922(g)(1) regulates conduct protected by the Second Amendment, that court moved on to examine whether the Government had met its burden of demonstrating that stripping firearms from one convicted of Range's prior felony offense is consistent with the Nation's historical tradition of firearm regulation.[37] The Third Circuit determined "that the Government ha[d] not carried its burden."[38] First, it observed that § 922(g)(1) itself was too recent to demonstrate a historical tradition of disarming felons such as Range.[39]

Second, that court noted that older statutes to which the Government cited were insufficiently analogous to justify prohibiting Range from possessing

---

[33]  *Range*, 69 F.4th at 106.
[34]  *Id.* at 98.
[35]  *Id.* at 101.
[36]  *Id.* (quoting *Heller*, 554 U.S. at 580). *See id.* at 101-03.
[37]  *Id.* at 103.
[38]  *Id.*
[39]  *Id.* at 103-04.

firearms.[40] Specifically, the Government's attempts to analogize Range to "groups [the Founders] distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that Range is part of a similar group today."[41] And although certain felony offenses—such as counterfeiting a public security, forgery and horse theft—were punishable by death, that fact "does not suggest that the *particular* (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and tradition" since the "execution of some individuals convicted of certain offenses does not mean the State, then or now, could constitutionally strip a felon of his right to possess arms if he was not executed."[42] To the contrary, felons could often purchase arms again after completing their sentences.[43]

Moreover, although founding era laws often provided for the forfeiture of a weapon used to commit a crime, that is distinct, the Third Circuit stated, from forever prohibiting that individual from possessing a weapon.[44] For those reasons, the Third Circuit held in its "narrow" decision that, "[b]ecause the Government has not shown that our Republic has a longstanding history and tradition of depriving people like Range of their firearms, § 922(g)(1) cannot constitutionally strip him of his Second

---

[40] *Id.* at 104-06.
[41] *Id.* at 104-05.
[42] *Id.* at 105.
[43] *Id.*
[44] *Id.* at 105-06.

Amendment rights."[45]

### B. Whether § 922(g)(1) is Unconstitutional as Applied to Robinson

Robinson argues that § 922(g)(1) is unconstitutional as applied to him.[46] Although the United States Court of Appeals for the Eighth Circuit has rejected a case-by-case, as-applied analysis for § 922(g)(1),[47] the Third Circuit endorsed that approach in *Range*,[48] and this Court will therefore conduct such an analysis here. The Court concludes that § 922(g)(1) withstands an as-applied challenge by a defendant who has been convicted of grand theft of a vehicle.

The search for historical analogues is somewhat complicated when addressing a law that strips firearms from individuals who have stolen motor vehicles, as such technology—and consequently such offenses—did not exist during the founding era or reconstruction. The Court must therefore consider varied analogues in analyzing whether § 922(g)(1) may properly bar individual convicted of grand theft of a vehicle from possessing firearms.

#### 1. Historical Prohibitions on the Possession of Firearms

"At the time of the drafting of the Constitution, 'every state had gun control legislation on its books,'"[49] although those laws often varied in complexity and

---

[45] *Id.* at 106.
[46] Docs. 41, 43.
[47] *United States v. Jackson*, 69 F.4th 495, 502 (8th Cir. 2023).
[48] *Range*, 69 F.4th at 106.
[49] Paul Finkelman, *"A Well Regulated Militia": The Second Amendment in Historical Perspective*, 76 Chi.-Kent L. Rev. 195, 211 (2000) (quoting Michael A. Bellesiles, *Gun Laws*

purpose. The historical record nevertheless makes clear that, in the years surrounding the Founder's Era and into the Reconstruction Era, certain broad classes of individuals were prohibited from carrying firearms.

The first class of individuals to whom such bans were applied were "those disloyal to the government," with particular concern "that people opposed to those in power would join or support insurrections."[50] In that vein, "[d]uring the American Revolution, several states passed laws providing for the confiscation of weapons owned by persons refusing to swear an oath of allegiance to the state or the United States."[51]

In 1775, Connecticut passed a law providing that any individuals "who actively assisted the British were imprisoned and forfeited their entire estate, while persons who libeled or defamed acts of the Continental Congress were disfranchised and prohibited from keeping arms, holding office, or serving in the military."[52] In 1776 and 1777, Massachusetts, Pennsylvania, and New Jersey enacted legislation

---

*In Early America: The Regulation of Firearms Ownership, 1607-1794*, 16 Law & Hist. Rev. 567, 587 (1998)).

[50] Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020).

[51] Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506 (2004).

[52] Greenlee, *supra*, at 264 (citing G.A. Gilbert, *The Connecticut Loyalists in* 4 Am. Historical Rev. 273, 282 (1899)).

that stripped individuals of their firearms if they were deemed to be "disaffected to the cause of America" or "dangerous to the present Government."[53]

Later that year, North Carolina and Virginia both passed laws that stripped those who refused to take an oath of loyalty of all citizenship rights, and prohibited any who stayed within those states from having "Guns or other Arms within his or their house."[54] Following the lead of those states, in 1779 Pennsylvania amended its laws "to disarm any person or persons who shall not have taken any oath or affirmation of allegiance to this or any other state" after Pennsylvania determined that "it is very improper and dangerous that persons disaffected to the liberty and independence of this state shall possess or have in their own keeping, or elsewhere, any firearms."[55] This law meant "that those refusing to take the oath or affirmation were unable to borrow or even use another person's firearms."[56]

Nor were those deemed disloyal to the cause of independence the only class of individuals who were prohibited from possessing firearms. Maryland and Virginia passed laws disarming Catholics in 1756, with Pennsylvania following suit in

---

[53] *Id.* at 264-65 (citing Mass. Gen. Laws ch. 21 (1776); 8 The Statutes at Large of Pennsylvania from 1682 to 1801, 559-60 (1902); 9 The Statutes at Large of Pennsylvania from 1682 to 1801, 110-14 (1903); 1777 N.J. Laws 90, ch. 40 § 20).

[54] *Id.* at 265 (citing 24 The State Records of North Carolina 89 (Walter Clark ed. 1905); 9 William Waller Hening, The Statutes at Large; a Collection of all the Laws of Virginia 282 (1821)).

[55] *Id.* (quoting The Acts of the General Assembly of the Commonwealth of Pennsylvania 193 (1782)).

[56] Cornell & DeDino, *supra*, at 506-07.

13

1759.[57] As Justice Amy Coney Barrett—then a judge for the United States Court of Appeals for the Seventh Circuit—explained in a 2019 dissenting opinion, Catholics were disarmed "'on the basis of allegiance, not on the basis of faith.'"[58]

So too did early American laws strip certain racial minorities, notably African Americans and Native Americans, of firearms. Consequently, "[n]ineteenth-century prohibitions on arms possession were mostly discriminatory bans on slaves and freedmen," particularly in the southern states.[59] Native Americans "were disarmed as a matter of course," and "many states even constitutionalized the disarmament of slaves and Native Americans."[60] These laws were enacted because such groups "were thought to pose more immediate threats to public safety and stability."[61]

These laws, although somewhat disparate in their targets and impact, all share a common concern and throughline. They were all targeted at groups that lawmakers

---

[57] Greenlee, *supra*, at 263 (citing 52 Archives of Maryland 454 (J. Hall Pleasants ed., 1935); 7 William Waller Hening, The Statutes at Large; a Collection of all the Laws of Virginia 35 (1820); 5 The Statutes at Large of Pennsylvania from 1682 to 1801, 627 (WM Stanley Ray ed., 1898)).

[58] *Kanter v. Barr*, 919 F.3d 437, 457 (7th Cir. 2019) (Barrett, J., dissenting) (quoting Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157 (2007)).

[59] Greenlee, *supra*, at 269 (citing 1804 Miss. Laws 90; 1804 Ind. Acts 108 § 4; 1806 Md. Laws 44; 1851 Ky. Acts 296 § 12; 1860-61 N.C. Sess. Laws 68; 1863 Del. Laws 332). *See also* Cornell & DeDino, *supra*, at 505 ("A variety of race-based exclusions disarmed slaves, and in some cases, free blacks" (citing Act of Feb. 4, 1806, 1805-1806 Va. Acts ch. XCIV, at 51)).

[60] *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting (citing Joyce Lee Malcolm, *To Keep and Bear Arms* 18-19, 122 (1994); Adam Winkler, *Gunfight* 115 (2011); Alexander DeConde, *Gun Violence in America* 22 (2001); Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 208-09 (2006)).

[61] *Id.*

deemed dangerous or disruptive to society, and were aimed at protecting the public from violence and disorder.[62]

### 2. Application of the Historical Record to Robinson's Felony Offense

Using these early American laws as rough historical analogues, the question of "how and why the regulations burden a law-abiding citizen's right to armed self-defense"[63] leads to the conclusion that these laws are relevantly similar to a law that prohibits individuals who steal motor vehicles from possessing firearms.

As to the "why" metric, the Nation's and States' early laws would today rightly be considered odious, as they prohibited racial minorities, religious minorities, and those who would not swear oaths of loyalty to a particular state from possessing firearms. But, as detailed above, those laws were targeted at groups that

---

[62] *See* Greenlee, *supra*, at 262 (noting that "Americans continued some English arms traditions, including the tradition of disarming those perceived as dangerous. Like English laws, colonial laws were sometimes discriminatory and overbroad—but even those were intended to prevent danger"); Cornell & DeDino, *supra*, at 507 (observing that "[t]he right to bear arms, however, did not outweigh the state's interest in maintaining security through disarmament of those considered dangerous to the state"); *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting) (stating that "founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety"); *Range*, 69 F.4th at 111 (Ambro, J., concurring, joined by Greenaway and Montgomery-Reeves, JJ.) (noting that laws prohibiting the possession of firearms were "driven by the fear of those who, the political majority believed, would threaten the orderly functioning of society if they were armed"); *Jackson*, 69 F.4th at 504 (observing that "[l]egislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed").

[63] *Bruen*, 142 S. Ct. at 2132-33.

lawmakers deemed dangerous or disruptive, and the laws sought to protect the public from violence and disorder that such individuals may cause or incite.[64]

Here too, lawmakers have made a reasoned decision that individuals who have committed serious felony offenses such as stealing motor vehicles are dangerous or disruptive to society. Regardless of whether such individuals may properly be considered dangerous, they are certainly highly disruptive to the orderly functioning of society. As my colleague, the Honorable Robert D. Mariani, recently noted in a similar context, individuals who unlawfully possess firearms, "particularly when also having been convicted of a crime of theft, present a clear example of those persons who are not to be trusted by society."[65] The "why" of the early laws prohibiting possession of firearms therefore aligns closely with the "why" of modern laws prohibiting such felons from possessing firearms: to protect the public from disorder and disruption.

The "how" is just as easily discerned, and fits § 922(g)(1) just as well. The founding generation determined that preventing disruption of an orderly society could only be achieved by stripping certain individuals of firearms, thereby preventing the disorder that lawmakers feared would result from permitting potentially subversive groups to possess dangerous weapons.

---

[64] *Greenlee, supra*, at 262; Cornell & DeDino, *supra*, at 507; *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting); *Range*, 69 F.4th at 111 (Ambro, J., concurring, joined by Greenaway and Montgomery-Reeves, JJ.).
[65] *United States v. Davis*, No. 3:23-CR-60, 2023 WL 6810249, at *11 (M.D. Pa. Oct. 16, 2023).

In our time, lawmakers no longer view protected classes as dangerous, nor do they require oaths of loyalty to purchase firearms. But modern society has, similar to the founding generation, decided that the only effective method of protecting a functioning society is by disarming felons who have been convicted of offenses such as stealing motor vehicles[66]—even more so given "the understandable worry about felon recidivism."[67] The "how" of those early laws—protecting the safety and order of society at large—and the "how" of modern laws, providing similar protection, therefore closely align.

Consequently, the Court easily concludes that those early American laws are sufficiently analogous to § 922(g)(1) as applied to individuals such as Robinson, and § 922(g)(1) "is consistent with this Nation's historical tradition of firearm regulation."[68] That law—as applied to Robinson—therefore falls outside the protection of the Second Amendment, and the indictment against Robinson must stand.[69]

---

[66] *See Jackson*, 69 F.4th at 504-05 ("The 'very structure of the Gun Control Act demonstrates that Congress . . . sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous'" (quoting *Barrett v. United States*, 423 U.S. 212, 218 (1976)).

[67] Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and A Research Agenda*, 56 UCLA L. Rev. 1443, 1499 (2009).

[68] *Bruen*, 142 S. Ct. at 2126.

[69] Because the Court concludes that disarming Robinson based on his prior felony conviction is constitutional, it declines to address at this time whether a prohibition on his possession of a firearm would likewise be permissible because Robinson was on state probation at the time that he possessed a firearm.

In sum, Robinson asks the Court to hold that felons who have committed serious offenses such as stealing motor vehicles maintain an inviolate right to possess firearms. But no constitutional right is inviolate, and the Second Amendment does not present a "regulatory straightjacket."[70] Moreover, "the right to keep and bear arms always has been subject to careful limitations," which "are at their zenith when applied to people who are the antithesis of the law-abiding citizen who wants to exercise his or her right to self-defense, whether at home or in public, and who may also enjoy the various sports and other activities that involve guns."[71]

Rather than take up Robinson's invitation, this Court heeds—as it must—the wisdom of our Nation's founding generation, which demonstrated through early American legislation that the right to bear arms must by necessity yield to the need to safeguard the Country's citizens and the proper functioning of our Society. To hold otherwise would be to sacrifice the safety and well-being of this Country upon the altar of an absolute and unqualified right to possess firearms. This is not what our Founders intended, and it is not a step that this Court will take. Unlike the situation with which the Third Circuit was presented in *Range*, here the historical record supports the disarmament of Robinson and those like him. Accordingly, Robinson's motion to dismiss the indictment will be denied.

---

[70]   *Id.* at 2133.
[71]   *Atkinson v. Garland*, 70 F.4th 1018, 1037 (7th Cir. 2023) (Wood, J., dissenting).

## III.   CONCLUSION

For the foregoing reasons, the Court concludes that the indictment does not violate Robinson's Second Amendment rights, and Robinson's motion to dismiss the indictment will be denied.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge
